**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| PATRICK SAUNDERS | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | FILE NO. 1:12-cv-01750-BMC |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | RESPONSE TO THIS COURT'S |
| NCO FINANCIAL SYSTEMS, INC. | ) | DECEMBER 21, 2012 ORDER TO |
| | ) | SHOW CAUSE |
| Defendant. | ) | |
| _____ | ) | |

On December 21, 2012 this Court entered an order directing Mr. Saunders and his counsel to show cause why it should not impose Rule 11 sanctions for the reasons stated in its December 21, 2012 Memorandum Decision and Order. Mr. Saunders and his counsel now submit their response to this Court's order.

**A. Mr. Saunders had no reason to believe that NCO could not locate the account in connection with which it sought to collect a debt from him without more information than his name and the address at which he lived for the past four years.**

This Court suggests that Mr. Saunders "may have engaged in a game of cat and mouse with first his creditor and then its collection company, obscuring his identity so that there was no way the collection company could know who it was dealing, all for the purpose of creating this lawsuit." Document 31, Memorandum Decision and Order, at 1 of 14. Mr. Saunders engaged in no such game. This Court further suggests that "[t]he record before me clearly raises an issue as to whether plaintiff deliberately misled NCO for the purpose of creating a claim against it under the FDCPA and the TCPA that could be settled for nuisance value plus attorneys' fees." *Id*. at 11 of 14. Mr. Saunders did no such thing.

In suggesting that Mr. Saunders acted improperly, this Court states: "It would have been so easy for [Mr.] Saunders, in his March 16, 2011 letter, to have simply stated that he was PLS

1

of Glenn Dale, Maryland . . . ." *Id*. Yet, as of March 16, 2011, Mr. Saunders had absolutely no idea that NCO was attempting to collect a debt relating to his PACER account. Thus, he had no reason to believe that NCO could have responded to his written request for information about the debt that it sought to collect from him, or would have complied with his cease and desist demand, should he have "stated that he was PLS of Glenn Dale, Maryland." Quite contrary, Mr. Saunders quite reasonably believed that a debt collector who left twenty-one voice messages for him on his cellular telephone number—not one of which provided Mr. Saunders with any indication that the debt it sought to collect from him related to his PACER account—would properly attribute his requests to its applicable account by reference to nothing more than Mr. Saunders' name and the address at which he lived for the past four years. This is especially true where the New York City Debt Collection Law requires that debt collectors maintain "a separate file for each debt . . . in a manner that is searchable or retrievable by the name, address and zip code of the consumer . . . ." New York City Debt Collection Law § 2-193.

**1.  Mr. Saunders did not receive the single letter that NCO mailed to his mother's Maryland address.**

On October 6, 2010, PACER placed Ms. Saunders' account with NCO for collection. Document 26-1, NCO's Undisputed Statement of Facts, at ¶3. On October 11, 2010, NCO mailed an "initial validation letter" to the Maryland address that Ms. Saunders included on his application for a PACER account. *Id*. at ¶6. Noteworthy, Mr. Saunders hasn't lived at the Maryland address to which NCO mailed its letter—which is his mother's address—since he graduated from high school in 1998. Deposition Transcript of Patrick Saunders ("Saunders Transcript"), 11:17-25, attached as Exhibit A. Not surprisingly, Mr. Saunders did not receive NCO's letter. *Id*., 127:23-25; 128:1-14.

2

**2. Not once through the thirty-four telephone calls that NCO placed to Mr. Saunders, or by way of the twenty-one voice messages that it left for him, did NCO inform Mr. Saunders that it was attempting to collect a debt relating to his PACER account.**

On October 14, 2010, NCO began calling Ms. Saunders' cellular telephone number. Document 26-1, NCO's Undisputed Statement of Facts, at ¶8. On ten occasions, from October 14, 2010 through May 5, 2012, NCO placed telephone calls to Ms. Saunders' cellular telephone number, but terminated the calls without speaking to Mr. Saunders or leaving a voice message for him. Document 26-4, NCO's Internal Debt Collection Notes, at 8-9 of 29; Deposition Transcript of Greg Stevens ("Stevens Transcript"), 64:4-12, attached as Exhibit B. On twenty-one occasions, from December 10, 2010 through May 17, 2011, NCO placed calls to Ms. Saunders' cellular telephone number and "played" the following pre-recorded voice message:

> This is a message from NCO Financial Systems, a debt collection company. This is an attempt to collect a debt, and any information obtained will be used for that purpose. Please return the call to Anthony Davis at 1-800-956-4638. Again, that's Anthony Davis at 1-800-956-4638. Thank you. NCO Financial Systems is a debt collection company. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Document 26-4, NCO's Internal Debt Collection Notes, at 8-9 of 29; Document 1, Complaint, at ¶14; Stevens Transcript, 66:17-25; 67:1-25; 68:1-2; Saunders Transcript, 63:1-25; 64:1-10.

On three occasions, from January 11, 2011 through May 1, 2011, NCO placed telephone calls to Ms. Saunders' cellular telephone number, yet did not reach either Mr. Saunders or his voice mailbox. Document 26-4, NCO's Internal Debt Collection Notes, at 8-9 of 29; Stevens Transcript, 68:4-7.

Quite significant, despite that NCO placed no less than thirty-four telephone calls to Mr. Saunders from October 14, 2010 through May 17, 2011, notwithstanding that NCO reached Mr. Saunders' voice mailbox on no less than thirty-one occasions during that time period, and no

3

matter that NCO left Mr. Saunders no less than twenty-one voice messages during that time period, NCO did not once inform Mr. Saunders that it was calling regarding his PACER account. Consequently, as of May 17, 2011, Mr. Saunders—not having received NCO's "initial validation letter"—knew absolutely nothing about the debt that NCO was attempting to collect from him:

> You have to understand, I did not know anything about this account at this point. I don't know who you are, what you are calling about. I just know this guy, Anthony Davis, would not leave me alone.

Saunders Transcript, 117:25; 128:1-6.

### 3. Unaware of what debt NCO was attempting to collect from him, Mr. Saunders attempted to obtain information from NCO about "the account" that it was calling him regarding.

Mr. Saunders' lack of information about the debt that NCO was attempting to collect from him was not due to his own indifference or lethargy. In fact, on March 16, 2011, Mr. Saunders mailed to NCO a letter requesting, among other information, that it "provide me with competent evidence that I have a legal obligation to pay you." Document 26-4 at 14 of 29, March 16, 2011 Correspondence.

Worth mentioning, as of March 16, 2011, Mr. Saunders was not aware that an outstanding balance remained on his PACER account. Saunders Transcript, 119:23-25; 120:1-4. He did later concede, upon being informed that NCO was attempting to collect a debt arising from his PACER account, that "I believe this is my debt," and that "this appears to be something that I opened." *Id*. As of March 16, 2011, Mr. Saunders was, however, aware that debt collectors other than NCO had previously attempted to collect various debts from him relating to private student loans; loans that he incurred after he no longer lived at his mother's Maryland address. *Id*., 58:17-19; 64:20-25; 65:1.

On April 22, 2011, NCO responded to Mr. Saunders' March 16, 2011 letter by stating:

4

> [W]e have been unable to locate the matter you have referenced from information we have been provided. Please provide us with further information such as your social security number, the telephone number that you claim NCO is calling in addition to the telephone number that you claim NCO is calling from in order to further research your claim and the billing address of the account. A copy of any correspondence you may have received from us would also be of assistance.

Document 26-4 at 16 of 29, April 22, 2011 Correspondence.

Still without any information about "the account," on April 27, 2011 Mr. Saunders mailed a letter to NCO reading, in part:

> I received your correspondence from April 22nd requesting for more information.
>
> Please note that I have <u>never</u> received any prior written communications from your offices about the alleged debt. The last automated call was on April 26th 4:24pm asking for me to call Anthony Davis with NCO at phone number 1-800-956-4638.
>
> Prior to that: April 20th 12:57pm, April 12th 2:47pm & 9:45am, April 7th 1:1 pm & 11:01 am etc..
>
> . . . . Furthermore, I do not feel comfortable nor should I be required to provide you with any addition information namely my social security number in order for you to locate any records at your offices if there indeed an account of an alleged debt. My name and address should be sufficient enough information for you to do a reasonable search for responding to my validation request on April 11th.

Document 26-4 at 18 of 29, April 27, 2011 Correspondence.

Regarding his refusal to provide NCO with his social security number, Mr. Saunders explained: "I didn't feel comfortable -- as I stated to them in the letter -- feel comfortable releasing my social security number." Saunders Transcript, 113:12-14. As for all other information—such as the "firm name" that Mr. Saunders entered on his application for a PACER account: "Pls"—Mr. Saunders made clear that he didn't realize that NCO needed that information as he didn't know that NCO was attempting to collect a debt relating to his PACER

5

account. *Id.*, 113:22-25; 114:1-2.Indeed, Mr. Saunders had no reason to believe that NCO could not "do a reasonable search for responding to [his] validation request on April 11th" with nothing more than "the name Patrick Saunders and the Dean Street, Brooklyn address." *Id.*, 114:3-15.

4. **New York City Debt Collection Law requires that debt collectors maintain a separate file for each debt in a manner that is searchable or retrievable by the name, address and zip code of the consumer.**

New York City Debt Collection Law states:

> **§ 2-193 Records to be maintained by debt collection agency.** (a) Unless otherwise prohibited by federal, state or local law, a debt collection agency shall maintain a separate file for each debt that the debt collection agency attempts to collect from each consumer, in a manner that is searchable or retrievable by the name, address and zip code of the consumer and the creditor who originated the debt the agency is seeking to collect.

New York City Debt Collection Law, attached as Exhibit C.

Mr. Saunders was aware of, and considered the New York Debt Collection Law, when preparing his March 16, 2011 letter to NCO. Saunders Transcript, 114:10-15.

5. **Not until May 23, 2011, did Mr. Saunders learn that the debt that NCO was attempting to collect from him related to his PACER account.**

Not until May 23, 2011, did Mr. Saunders learn that NCO was attempting to collect a debt from him relating to his PACER account. *Id.*, 118:7-25; 119:1-22. Likewise, not until May 23, 2011, did Mr. Saunders become aware that NCO mailed written correspondence his mother's Maryland address. *Id.*, 120:7-11.

6. **Mr. Saunders did not file his lawsuit in bad faith, or for any improper purpose.**

Mr. Saunders was not "engaged in a game of cat and mouse with first his creditor and then its collection company." Nor did he "deliberately misled NCO for the purpose of creating a claim against it under the FDCPA and the TCPA that could be settled for nuisance value plus attorneys' fees." Rather, Mr. Saunders received twenty-one voice messages from NCO regarding

"a debt," and took reasonable steps to determine the nature of that debt. He did so by using the information that NCO made available to him, and against the backdrop of the New York City Debt Collection Law. Nothing more, nothing less. He later filed a lawsuit against NCO for violations of the FDCPA and TCPA. While this Court ultimately ruled that his claims were without merit, Mr. Saunders did not file his lawsuit in bad faith, or for any improper purpose.

**B. NCO's internal debt collection notes indicate that it was aware that Mr. Saunders was the individual associated with its account listing "Pls" as the debtor," and "could or should have found his name based on the contact person listing of 'P. Saunders'."**

This Court states that "Mr. Saunders' entire case," which it suggests was filed in bad faith and for an improper purpose, "is premised on the assumption that NCO could or should have found [Mr. Saunders'] name based on the contact person listing of 'P. Saunders." Document 31, Memorandum Decision and Order, at 6 of 14. This Court explains that Mr. Saunders did not give "NCO sufficient information to identify the account," *id.*, and therefore "[t]he fact that Patrick Saunders of Brooklyn wished to revoke prior express consent was meaningless; it may as well as well have been John Smith of Tacoma making the request." *Id*. This Court further states: "No amount of effort on NCO's part would have disclosed that Patrick Saunders of Brooklyn was actually PLS of Maryland." Accordingly, this Court reasons that "[w]hether this is a deliberate problem that [Mr. Saunders] created or one that he simply neglected to fix, the problem was entirely of his own making, not that of NCO." *Id*. at 7 of 14.

NCO's internal debt collection notes suggest otherwise. They include a good deal of circumstantial evidence that NCO was aware—well before May 23, 2011, as its designated corporate representative indicates, *see* Document 26-4, Affidavit of Greg Stevens, at ¶16—that Mr. Saunders' name was associated with its account listing "Pls" as the "debtor. Accordingly,

the "problem" that this Court references was not of Mr. Saunders' making. In fact, the "problem"

was likely not a problem at all.

1.  **On August 27 2009, Mr. Saunders opened an account with PACER, listing "Pls" as the "firm name," "P. Saunders" as the "contact," the billing address for the credit card that he used to open the account as the "address," his personal cellular telephone number as the "phone number," and his personal email address as the "primary email."**

On August 27, 2009, Ms. Saunders entered information into a PACER account

maintenance form. The form required Mr. Saunders to enter certain information into designated

fields. The form that Mr. Saunders completed reads, in part:

| | |
|---|---|
| Firm Name: | Pls |
| Contact: | P. Saunders |
| Address: | ███████████ |
| City: | Glenn Dale |
| State: | MARYLAND |
| Zip Code: | 20769 |
| Phone Number: | ███████3776████ |
| Primary Email: | ███████████ |

*See* PACER Account Maintenance Form, attached as Exhibit D.

 Mr. Saunders opened a PACER account so that he "could read the filings in [a] Texas

criminal matter" in which he acted as a witness. Saunders Transcript, 85:15-17. He closed the

account sometime in 2010. *Id.*, 85:20-24.

When asked about the name in which he opened the account, Mr. Saunders responded:

I don't know what I typed into the actual form. I know there is an issue
with the name of how it is in the form, but, so, I don't know how it was set
in there.

\*      \*       \*

I don't remember what they asked me on the initial form. I think, if I'm
not mistaken, I had -- there was, at some point, I had my initials on there.

8

But in order to put my -- I mean, I know my name is on the account
because you have to have a credit card. My credit card has to have a full
name.

*Id.*, 86:13-16; 87:8-14.

Mr. Saunders explained that he entered his mother's Maryland address because:

[T]he account required -- that's the address associated with the [credit]
card [that Mr. Saunders linked to the PACER account], so the -- if I'm not
mistaken, you had to put certain information in order too create the
account. Like it, it won't let you go further in the account, so that's why I
had that particular address associated with this account.[1]

*Id.*, 94:22-25; 95:1-6.

The phone number that Mr. Saunders entered is his current cellular telephone number.

*Id.*, 96: 24-25; 97:1-4. The email address that Mr. Saunders entered is his current email address.

*Id.*, 97:22-25.

**2.   NCO's internal debt collection notes indicate that it knew that "P. Saunders"
was the name of the individual responsible for the debt that it was attempting to
collect in connection with its account listing "Pls" as the "debtor."**

NCO's internal debt collection notes for its account listing "Pls" as the "debtor" read, in

part: "SPECIAL NOTES: NAME IS P. SAUNDERS." Document 26-4, NCO's Internal Debt

Collection Notes, at 7 of 29. NCO's designated corporate representative, in fact, acknowledged

that "[o]n October 6, 2010 PACER placed an account with NCO in the name of "PLS,"

Document 26-4, Affidavit of Greg Stevens, at ¶6, and that "upon placement PACER provided

NCO with certain demographic information of the debtor. . . . 'P. Saunders' was provided as a

---

[1]     This Court stated that Mr. Saunders' testimony was "at least wrong and very probably
false." Document 31, Memorandum Decision and Order, at 13 of 14. Mr. Saunders testimony
may have been wrong, but it was based on a misunderstanding arising from his experience with
online payments. He did not intentionally provide false testimony.

contact at PLS."[2] *Id*. Without more, NCO's internal debt collection notes indicate that it knew the name of the individual associated with the debt that it sought to collect from "Pls" was "P. Saunders."

### 3. NCO's internal debt collection notes indicate that on December 12, 2010, one of its employees confirmed that Mr. Saunders' cellular telephone number had not been changed.

On December 2, 2010, one of NCO's employees—designated 007, *see* p.65, lines 23-25; p.66, lines 1-7—entered a comment in NCO's internal debt collection notes for its account listing "Pls" as the "debtor," reading:

> 007 12/02/10 9:03 CLLD 3776 N/A
> 007 12/02/10 9:04 3GPH GOOD PHONE NUMBER
> 007 12/02/10 9:04 Telephone contact attempted today

Document 26-4, NCO's Internal Debt Collection Notes, at 8 of 29.

NCO's designated corporate representative testified that the "GOOD PHONE NUMBER" entry, which directly follows the last four digits of Mr. Saunders' cellular telephone number, means that NCO's employee determined that "the reference phone" that PACER

---

[2]     NCO's designated corporate representative includes a footnote in his affidavit reading:

> This information was placed on the account as a contact at "PLS" to discuss the alleged debt. This information is housed in the special notes, an unsearchable area of the account, as the 'contact' is not considered a responsible party for the debt.

Document 26-4, Affidavit of Greg Stevens, at ¶6.

The premise of the footnote—that NCO could search its debt collection accounts relating to PACER by "firm name" only—defies common sense. This is especially true where the majority of PACER account owners are likely law firms. It is not reasonable to suggest NCO would send a debt collection letter to Smith & Smith—an international law firm with over one thousand employees—without addressing its letter to a specific individual. Nor is it reasonable to assume that NCO, as a matter of absolute policy and procedure, actually addresses debt collection letters to PACER account owners by "firm name" only.

provided to NCO—Mr. Saunders' cellular telephone number, ending in 3776—was not changed. Stevens Transcript, 60: 8-20. How would NCO's employee know that Mr. Saunders' personal cellular telephone number, which PACER provided to NCO in connection with the subject debt that it placed for collection, was not changed if he or she did not know that Mr. Saunders was the individual associated with its account listing "Pls" as the "debtor"?

**4.  NCO's internal debt collection notes indicate that on December 2, 2012, one of its employees requested, and received skip tracing information for its account listing "Pls" as the "debtor."**

On December 2, 2010, one of NCO's employees entered a comment in NCO's internal debt collection notes for its account listing "Pls" as the "debtor, reading: "Created new skiptrace request for 'debtor' window 2." Document 26-4, NCO's Internal Debt Collection Notes, at 7 of 29. NCO's designated corporate representative explained that the "skiptrace" notation means that "we send [Lexis Nexus] information on the account, address and so forth, and they would supply back skiptrace information." Steven Transcript, 58: 8-11. NCO's designated corporate representative described "skiptrace information":

> It could be alternate numbers, relatives, associates. It's an attempt to gain
> initial information about the alleged debtor.

*Id.*, 58:12-16.

On December 2, 2010, one of NCO's employees entered a comment reading: "Received skiptrace results for 'debtor' window." Document 26-4, NCO's Internal Debt Collection Notes, at 8 of 29.[3]

**5.  The "problem" that this Court references was not of Mr. Saunders' own making.**

---

[3]      Worth noting, an attorney at Weisberg & Meyers performed his own Accurint "skiptrace" using nothing more than Mr. Saunders' name, and his Dean Street, NY address. In *less than three minutes* he was able to link Mr. Saunders to his Maryland address. Affidavit of Craig Ehrlich.

Mr. Saunders provided "NCO sufficient information to identify the account." In fact, he provided NCO with the same individual name that PACER provided to NCO.

Additionally, "[t]he fact that Patrick Saunders of Brooklyn" attempted to obtain information about "a debt" that NCO contacted his cellular telephone to collect is not akin to "John Smith of Tacoma making the request." NCO's own internal debt collection notes actually indicate that one of its employees was able to confirm that Mr. Saunders' cellular telephone number was a "GOOD PHONE NUMBER" at which to contact the individual responsible for the subject debt, and received skip tracing information—alternate numbers, relatives, and associates—about its account listing "Pls" as the "debtor."

And, a very small "amount of effort on NCO's part would have disclosed that Patrick Saunders of Brooklyn was actually PLS of Maryland." Ignoring that it could have simply informed Mr. Saunders that it was attempting to collect a debt relating to his PACER account through just one of the twenty-one voice messages that it left for him—a circumstance that resolved the "problem" that this Court references within minutes of its occurrence on May 23, 2011—it could have simply reviewed its accounts for the name "Saunders." Notably, NCO does not suggest that doing so manually, even if it is true that it could not so by electronic search function, was burdensome. Indeed, the "problem" that this Court references was not of Mr. Saunders' own making.

**C. Mr. Saunders—a layman—prepared his March 16, 2011 and April 27, 2011 letters to NCO by copying, in part, a form letter that he found on the internet, and without assistance from Weisberg & Meyers.**

This Court states: "I don't know if plaintiff has legal training, but his letters of March 16, 2011 and April 2[7], 2011 strongly suggest that they were written by someone who does." Document 31, Memorandum Decision and Order, at 12 of 14. This Court then notes the legal

substance of Mr. Saunders' letters to NCO, as well as their "professionally-crafted tone." *Id*. This Court further explains that the simple fact that Mr. Saunders opened a PACER account "suggests some legal background or advice on [Mr. Saunders'] part."

Mr. Saunders is not a lawyer, nor does he have a paralegal degree. He copied the portions of the March 16, 2011 letter that this Court appears to be concerned with from a letter that he found on the internet. He received no assistance from Weisberg & Meyers in preparing any of the letters that he sent to NCO.

### 1. Mr. Saunders is a layman.

Mr. Saunders neither attended law school, nor paralegal school, although he has considered pursuing a career in law. Saunders Transcript, 50:13-25; 51:1-14. For a short period of time, and at the suggestion of one of his friends who worked for Legal Services, he "was training to, you know, do -- basically, work with civil litigants, with Disability, Social Security, HRA, all of that whole Shebang." *Id*., 50:13-17; 51:2-12. He did so for less than a year, and no longer works with or for Legal Services. *Id*., 51:8-15.

### 2. Mr. Saunders copied the portions of his March 16, 2011 letter that this Court appears to be concerned with from a form letter that he found on the internet.

Mr. Saunders used a form letter that he found on the internet to draft his March 16, 2011 letter to NCO. He copied the portions of the letter that this Court seems concerned with from that form letter:

> Be advised, this is not a refusal to pay, but a notice sent pursuant to the Fair Debt Collection Practices Act, 15 USC 1692(g) that your claim is disputed and validation is requested.

> his is NOT a request for "verification" or proof of my mailing address, but a request for VALIDATION made pursuant to the above named title and section. I respectfully request that your office provide me with competent evidence that I have any legal obligation to pay you.

Although the actual website on which Mr. Saunders found the form letter—an Alabama lawyer's website—no longer exists, a quick search demonstrates that many websites provide the very same, or nearly identical form letter. *See, e.g,* http://www.creditscorequick.com/downloads/creditscorequick_dvl_sample.pdf; http://www.creditinfocenter.com/forms/sampleletter9.shtml.

As for much of the information that Mr. Saunders did not copy from the website—in particular, the information regarding his medical condition—he copied large parts of that text from a pamphlet provided by a non-profit organization set up to help individuals with medical conditions deal with debt related issues.

### 3.  Mr. Saunders first contacted Weisberg & Meyers well after he mailed his March 16, 2011 and April 27, 2011 letters to NCO.

Weisberg & Meyers did not provide Mr. Saunders with any assistance in preparing any of the letters that he mailed to NCO. In fact, Mr. Saunders first contacted Weisberg & Meyers on October 21, 2011, which, of course, is well after the date that he mailed his March 16, 2011 and April 27, 2011 letters to NCO. *See* Affidavit of Craig Ehrlich, attached as Exhibit E. Mr. Saunders did not sign an attorney-client agreement with Weisberg & Meyers until February 20, 2012. *See* Redacted Attorney Client Agreement, attached as Exhibit F.

### 4.  The facts and circumstances underlying Mr. Saunders' May 16, 2011 and April 27, 2011 letters to NCO disprove any circumstantial evidence suggesting bad faith.

Although portions of Mr. Saunders' March 16, 2011 and April 27, 2011 letters to NCO do not read like a layman drafted them, other portions do. Mr. Saunders copied the portions of his letters that this Court seems concerned with from a form letter that he found on the internet. Weisberg & Meyers did not assist Mr. Saunders in preparing his letters. While this Court noted that the substance, style, and tone of Mr. Saunders' letters provide "circumstantial evidence

suggesting bad faith," the actual facts and circumstances underlying Mr. Saunders' actions demonstrate otherwise.

**D. That three separate and distinct debt collectors violated Mr. Saunders' rights under the FDCPA does not suggest that Mr. Saunders filed his lawsuit against NCO in bad faith.**

This Court notes that "it seems and odd coincidence that [Mr. Saunders'] FDCPA rights are being violated by so many collection agencies and a law firm (one of the defendants in these cases is a law firm)[4] simultaneously." Document 31, Memorandum Decision and Order, at 13 of 14. Mr. Saunders' financial condition, NCO's history of violating consumer protection statutes, and the Consumer Financial Protection Bureau's ("CFPB") 2012 Annual Report on the FDCPA, suggest that the facts and circumstances underlying Mr. Saunders' actions are not unusual.

**1. Despite that several debt collectors attempted to collect various debts from Mr. Saunders prior to NCO's efforts to collect a debt from him, his lawsuit against NCO marks the first time that he sued a debt collector.**

Prior to NCO's efforts to collect a debt from him several other debt collectors attempted to collect various debts from him. *Id*., 59:6-25; 60:1-14; 64:20-25; 65:1-11. Notwithstanding, the lawsuit that he filed against NCO was the first lawsuit that he filed under the FDCPA. *Id*., 61:9-10 ("Oh, yes, yes. This is the first time I ever sued a debt collector."); 65:9-10.

---

[4]     Noteworthy, in 1985 Congress found that more lawyers were engaged in debt collection than were lay persons and companies. *See Crossley v. Lieberman*, 868 F.2d 566, 569 (3d Cir. 1989) ("Data showed that 5,000 attorneys were engaged in the debt collection industry, compared to approximately 4,500 lay debt collection firms. H.Rep. No. 405, 99th Cong.2d Sess. (1985), *reprinted in* 1986 U.S. Code Cong. & Ad. News 1752, 1752."). Accordingly, Congress amended the FDCPA to subject lawyers to its regulations. *See Heintz v. Jenkins*, 514 U.S. 291, 294-95, 299 (1995).

**2. NCO was sued 279 times in 2012 in federal district courts; 259 of those lawsuits were filed under consumer protection statutes.**

NCO is a self proclaimed "industry leader" in the "accounts receivable management industry. http://www.ncogroup.com/About_NCO/Profile.html. NCO "operates a global network of over 100 operations centers running on a centralized data platform with the flexibility to respond to a rapidly changing marketplace, and to scale operations to meet client specifications." *Id*.

In 2012, in federal district courts alone, 279 lawsuits were filed against NCO. Affidavit of Craig Ehrlich. 259 of those law suits were filed under consumer protection statutes. *Id*.

**3. In 2011 alone, the FTC receive 142,743 consumer complaints about the debt collection industry.**

The CFPB explains that debt collection is a large, multi-billion dollar industry that directly affects many consumers. In 2011, approximately 30 million individuals, or 14 percent of American adults, had debt that was subject to the collections process (averaging approximately $1,400). CFPB Annual Report 2012, attached as Exhibit G, at 1.

The CFPB additionally notes that the FTC continues to receive more complaints about the debt collection industry than any other specific industry. Complaints about third-party debt collectors and in-house collectors in 2011 together totaled 142,743 complaints and accounted for 27.16% of all complaints the FTC received. CFPB Annual Report 2012 at 6.

Regarding third party debt collectors such as NCO, the CFPB explains that in 2011, consumer complaints to the FTC about third-party debt collectors increased in absolute terms and as a percentage of all complaints that consumers filed directly with the FTC. *Id*.

Inside ARM—a company devoted to "shift[ing] the public conversation about the [accounts receivables management] industry in order to help creditors and collection

16

professionals reduce risk, lawsuits, and bad press, *see* http://www.insidearm.com/about/—estimates that consumers filed over 10,000 FDCPA lawsuits in 2012 alone.

**4.   That Mr. Saunders' sued debt collectors other than NCO does not indicate that he advanced his claims against NCO in bad faith.**

It is neither odd, nor a coincidence, that a debt collection company that was sued 259 times last year in federal district courts for violating consumer protection statutes, and that is part of an industry about which the FTC received 142,743 consumer complaints last year, violated the FDCPA in attempting to collect a debt from Mr. Saunders. That unrelated debt collectors also violated Mr. Saunders' rights under the FDCPA does not suggest that he filed his action against NCO in bad faith.

WHEREFORE, Mr. Saunders and his counsel respectfully request that this Court discharge its December 21, 2012 order to show cause.

Respectfully submitted this 4th day of January 2013.

/s/ Marshall S. Meyers
Marshall S. Meyers
*Admitted pro hac vice*
Jeanne Lahiff
NY Bar No. 2252435
Weisberg & Meyers, LLC
80 Broad Street, 5th Floor
New York, NY 10004
(888) 595-9111 ext. 511
(866) 565-1327 (fax)
JLahiff@attorneysforconsumers.com

***Please send correspondence to the address below:***

***Weisberg & Meyers, LLC***
Attorneys for Plaintiff
5025 N. Central Ave. #602
Phoenix, AZ 85012

17

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 4, 2013, I electronically filed the foregoing document with the clerk of the U.S. District Court, for the Eastern District of New York, using the electronic case filing system of the court. Notification was sent to counsel of record below via the electronic case filing system of the court on this 4th day of January, 2013.

Aaron Easley
Sessions, Fishman, Nathan & Israel, L.L.C.
200 Route 31
Suite 203
Flemington NJ 08822 5736

<u>/s/ Kimberly Larson</u>
Kimberly Larson

18